UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Brett C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 18 CV 50134 |
| | ) Magistrate Judge Lisa A. Jensen |
| Andrew Saul, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM OPINION AND ORDER[1]

Plaintiff is seeking Social Security disability benefits based on limitations from a stroke occurring in the fall of 2014. He was then 49 years old. His main limitations are speech difficulties and right-sided weakness. An administrative law judge ("ALJ") found that plaintiff was not disabled largely because his condition gradually improved over time such that he was able to do part-time work and other activities consistent with the ALJ's findings. In this appeal, plaintiff argues that the ALJ should have developed the record in various ways. As explained below, the Court is not persuaded by this argument.

## BACKGROUND

The medical narrative begins on November 1, 2014, when plaintiff went to a hospital in Florida presenting with speech problems or, in the medical parlance, expressive dysphasia.[2] Doctors concluded that plaintiff had a stroke at some point. Over the next several weeks, tests and procedures were performed. On November 13, 2014, Dr. Jacques Morcos performed a

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.
[2] Plaintiff had recently moved to Florida to stay with his father. Sometime after the stroke, he moved to Illinois where the administrative hearing was held.

1

bypass procedure to address the problems from the stroke. On November 19, 2014, plaintiff was discharged from the hospital. He was provided a rolling walker and advised to participate in occupational therapy. According to plaintiff's later testimony, this therapy took place over the next three to four months. However, the therapy records were not made a part of the administrative record for reasons that are not known.

On January 29, 2015, while still in Florida, plaintiff saw neurologist Dr. Nils Mueller-Kronast as a follow-up to his hospital treatment. This would be plaintiff's only visit with this doctor. Dr. Mueller-Kronast observed that plaintiff weighed 285 pounds; that he could walk independently with a limp but he did not need a cane; that he had a 4/5 weakness in his right shoulder with some difficulty and a possible frozen shoulder; and that his coordination was intact with a degree of weakness. R. 343. Dr. Mueller-Kronast told plaintiff that he needed to lose weight, which was described in the notes as a "drastic risk factor modification." *Id.* Dr. Mueller-Kronast concluded as follows:

> Clinically [plaintiff] is significantly improved, but still has nonfluent speech and especially proximal right upper extremity weakness. He is independently ambulating. In the meantime, he has undergone smoking cessation.

R. 342.

The following week, plaintiff filed for disability benefits under both Title II and XVI.

On March 16, 2015, Dr. Mueller-Kronast wrote a one-paragraph letter supporting plaintiff's disability applications. The letter states as follows:

> This letter serves to certify that Mr. [C] is completely and totally disabled. He suffered a debilitating stroke and as a result is completely unable to obtain or participate in any type of gainful employment. He still suffers from residual cognitive impairment as well as non-fluent speech and upper extremity weakness. Please feel free to contact my office with any questions or if I can be of further assistance.

R. 345.

On July 14, 2015, plaintiff was seen by consultative examiner Dr. K.P. Ramchandani who examined plaintiff for 30 minutes and then prepared a report. Ex. 4F. Set forth below are two screenshots from the report, which summarize some of the key observations:

PHYSICAL EXAMINATION: Reveals him to be alert, obese, in no acute physical distress. Pulse: 84 /min. Rhythm: regular. Resp: 12min. BP: 110/70. Height: 69". Weight: 268 pounds. His gait is normal, unassisted. He is able to walk on heels and toes. He is able to squat and get up without support. He is able to get on and off the examination table without assistance. He is able to dress and undress without assistance. He is right-handed. Grip is 4/5 on the right and 5/5 on the left. He is able to make a fist, pick up objects, open and close the door, oppose the thumb to fingers and flip pages.

* * *

CNS EXAMINATION: Speech is slightly slurred and searching for words. He is able to recall current and past presidents. He knew the meaning of don't cry over spilled milk and the grass is greener on the other side of fence. He is able to do serial seven's. He is alert, oriented to time, place and person. He is well dressed and answers questions appropriately with proper eye contact. His ability to relate is normal. From observation claimant is capable of handling funds in his own interest. Cranial nerves are intact. He is able to hear and understand conversational voice without difficulty. Motor system: Power is 5/5 in the lower extremities and left upper extremity. Power at the right shoulder is 3+/5, at the right elbow 4/5 and at the right wrist 4/5, no wasting. Tone is slightly increased in the right upper extremity. Reflexes are brisk on the right, and 2+ on the left. Plantars equivocal bilaterally. Sensory system: No deficit to touch and pin prick in all four extremities.

R. 351.

On July 27, 2015, Dr. Lenore Gonzalez, a state agency physician, made a residual functional capacity ("RFC") assessment. *See* Exs. 3A, 4A. Dr. Gonzalez reviewed both Dr. Ramchandani's report, as well as Dr. Mueller-Kronast's treatment notes and opinion letter. Dr. Gonzalez opined that plaintiff could occasionally lift or carry 20 pounds, could frequently lift or carry 10 pounds, and could sit, walk, or stand six hours in an eight-hour day. On November 30, 2015, Dr. Dimitri Teague, another agency doctor, reached the same conclusions. Exs. 7A, 8A.

On March 29, 2016, plaintiff established care with FHN Family Healthcare Center. At the initial visit with a nurse practitioner, plaintiff explained that he was seeking a DOT physical and stated that most of his problems with his right side were "gone" and that he did not have any deficits other than a few issues with his left eye. R. 403. He also reported that he was exercising 15 to 30 minutes a day, walking and doing squats and jumping jacks. *Id.*

On April 18, 2016, plaintiff saw Dr. Seema Kumar at FHN Neurology. Plaintiff reported that he had blurry vision in the left eye and felt weak on his right side since his stroke. R. 388. On the neurological examination, Dr. Kumar noted that plaintiff's motor strength was 4+ over 5 on the right side, that he had brisk reflexes on the right, that his coordination was slow on the finger-nose-finger test on the right side, and that his gait was normal but that he was unable to do the tandem walk. R. 389. Dr. Kumar did not record any cognitive limitations. *See* R. 389 ("Patient is alert, awake and oriented to time, place and person. Speech and language are intact. Recent and remote memory is intact. Attention span and fund of knowledge was normal.").

Plaintiff saw Dr. Kumar again on June 14, 2016. The reason for this visit was that plaintiff wanted to talk about whether he could drive a commercial vehicle. R. 392. Dr. Kumar ordered an updated MRI and told plaintiff not to engage in "driving [a] commercial vehicle at this point." R. 393. On July 19, 2016, Dr. Kumar referred plaintiff to neurosurgery for an evaluation based on some abnormalities seen in the recent MRI. R. 397.

On October 6, 2016, plaintiff treated with Dr. Gayatri Sonti at Nhc Neurosurgery. Plaintiff reported that he had "mild speech problems due to his previous small stroke." R. 444. Dr. Sonti noted that plaintiff denied any "motor or sensory losses." R. 446. On the neurological part of the examination, Dr. Sonti wrote the following:

> **NEUROLOGICAL**: mental status, speech normal, alert and oriented x 3, cranial nerves II-XII intact, motor exam grossly normal, sensation grossly normal, gait

4

and station normal. NORMAL COMPREHENSION, UNDERSTANDING AND
MEMORY. [M]ild expressive aphasia.

*Id.* The doctor stated the following at the end of the report: "Other than mild expressive aphasia, will repeat MRI in 6 months. Ok to return to drive." *Id.*

The administrative hearing was held on April 25, 2017. Plaintiff testified that just after the stroke, he lost his ability to speak and could not walk or use his right arm "at all." R. 38. But after a period of rehabilitation, he was eventually able to walk by building up strength in his right leg. R. 39. But he still had some problems because "the words don't come out of my mouth." *Id.*

The ALJ asked a series of questions about plaintiff's recent efforts to get his commercial driver's license and to work as a truck driver. The ALJ asked specifically about whether plaintiff could pass the required physical. After mentioning a possible concern about a cataract in his left eye, plaintiff then stated: "I think I could pass the physical." R. 45. He also stated that he believed he could do a 40-hour truck driving job "because I can sit for driving." R. 49. However, he did not believe that he could do a job where had had to stand "most of the time." *Id.*

The ALJ also asked about plaintiff's part-time job working for the Salvation Army. Plaintiff stated that he worked two days a week, from 10:30 to 2:00, but often had trouble walking home afterwards, which was "less than a mile." R. 50. He stated that he was let go from this job not because of his inability to do the work but because "basically there was nothing for [him] to do." R. 51. On this job, plaintiff mopped, swept, and "scrubbed the stove and the sinks, and the walls and the cabinets." *Id.*

On July 6, 2017, the ALJ found that plaintiff was not disabled. At Step Two, the ALJ found that plaintiff's severe impairments were obesity and a stroke. In the RFC analysis at Step Four, the ALJ found that plaintiff could do light work with the restriction that he only "occasionally engage in oral communication with co-workers and the general public" and that he

be limited to "frequent reaching and handling with the right upper extremity." R. 18. The ALJ found that plaintiff's allegations were not credible for multiple reasons. The ALJ gave great weight to the two agency opinions, but gave little weight to Dr. Mueller-Kronast's letter because it was conclusory and not supported by objective evidence.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19-20 (N.D. Ill. Oct. 29, 2014).

The Court will begin by summarizing plaintiff's arguments. As a preliminary observation, the Court notes that plaintiff's opening brief contains a fairly long summary of the facts and procedural history, taking up roughly two-thirds of the brief. However, it is often unclear why many of these facts are included, as they are not mentioned in the later analysis. The fact section also contains a lot of technical jargon. There are several long nearly verbatim summaries from medical reports.[3] But no effort has been made to translate these findings into plain language nor to explain how they advance plaintiff's arguments. By comparison, the argument section is only three and a half pages, and it mostly avoids discussing specific facts.[4] One problem with this abbreviated analysis is that several arguments are only mentioned in passing. As such, they have arguably been waived. *See Baker v. Colvin*, 2015 WL 719604, *4 (N.D. Ill. Feb.18, 2015) ("undeveloped" arguments, which rely on "passing references" to legal rules "without providing any substantive support," are deemed waived).

Turning to plaintiff's main arguments, the opening brief contains only one argument heading, which is that the "RFC determination is unsupported by substantial evidence because the ALJ failed to develop the record." Dkt. #12 at 10. But upon closer examination, this argument has two connecting parts. The first is the claim that the two State agency opinions did not provide substantial evidence for the ALJ's decision. The second contention follows from the first one. Given that the agency opinions did not constitute substantial evidence, the ALJ was obligated to further develop the record.

---

[3] Here is one example: "A CT of Plaintiff's brain revealed cutoff/occlusion of the left M1 segment with reconstitution of the distal branches including left M2 and M3 branches, which appeared to be reconstituting in part from leptomeningeal collaterals from the left anterior cerebral artery and to a lesser extent from leptomeningeal collateral from the left posterior cerebral artery when correlated with a recent angiogram from November 5, 2014." Dkt. #12 at 3. If one were to make a serious effort to try and understand this sentence—and there is no sense plaintiff hopes such an effort will be undertaken—one would need a good medical dictionary combined with the patience of a cruciverbalist tackling the Sunday New York Times crossword puzzle.

[4] The reply brief is even shorter, with just a page and a half of analysis.

Before assessing these arguments, it is worth noting that plaintiff in this appeal has not made any argument attacking the ALJ's decision to give little weight to Dr. Mueller-Kronast's letter opinion. Plaintiff has not argued, for example, that this opinion should have been given controlling weight under the treating physician rule. Plaintiff has thus implicitly conceded that Dr. Mueller-Kronast's opinion was inadequate.[5] Accordingly, in considering plaintiff's criticisms of the agency opinions, it is important to remember that plaintiff is not making a comparison argument in which Dr. Mueller-Kronast's opinion is counterpoised against those opinions. More to the point, there are no opinions in the record contradicting the agency opinions.

Plaintiff argues generally that the agency opinions were "weak," "check-box" opinions not supported by any medical records. Dkt. #12 at 11-12. More specifically, plaintiff criticizes the RFC finding that plaintiff could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds with his right arm. In making these arguments, plaintiff acknowledges that the agency doctors relied on Dr. Ramchandani's report, among other things, but plaintiff argues that this report was "bereft of any information" that might support the agency opinions. *Id.* at 11. The Court disagrees.

First, Dr. Ramchandani's report contains the following statement directly addressing plaintiff's lifting and carrying abilities:

> Brett [C] is a 50 year old Caucasian male patient who presented on July 14, 2015 with complaints of right upper extremity weakness and speech impairment following a stroke in November 2014. He claims to have difficulty raising [his] right arm above the shoulder level, *however he can lift and carry about 30 pounds with the right hand and 50 pounds with the left hand*.

---

[5] In his administrative appeal, plaintiff argued that the ALJ should have re-contacted Dr. Mueller-Kronast to obtain a "clarified" opinion. R. 332. The basis for this argument was that this opinion was "vague" and lacked "specific work-related limitations." *Id.*

R. 350 (emphasis added). Neither plaintiff, nor the Government, commented on this particular statement in their briefs. However, it speaks directly to the issue at hand. The specific weight referred to for the right arm (30 pounds) is above the weights listed in the RFC (20 and 10 pounds). The Court recognizes that some questions and counter-arguments could be raised about this one statement. For one thing, it is not clear whether the statement reflected a direct observation made by Dr. Ramchandani (the statement was not included in the examination portion of the report) or whether it was instead a self-report made by plaintiff. However, either way, this fact cuts against plaintiff's theory and provides support for the agency opinions. It is also true that the statement does not explicitly address *repeated* lifting over the course of an entire work day. But this argument goes to the weight of the statement, and does not negate the fact that the statement provides *some* evidence bearing on this question. Finally, the Court acknowledges that the agency physicians did not specifically mention this particular statement in their opinions. However, given that Dr. Ramchandani's report was only three pages (not including exhibits), it is reasonable to believe that the agency doctors were aware of and relied on this statement, especially since it was included prominently in the first paragraph of Dr. Ramchandani's report.

Second, even if this one statement were ignored, the rest of the report contains many observations bearing on plaintiff's right arm abilities. Many of them are described in the two screenshots set forth above. For example, Dr. Ramchandani did not observe plaintiff having any problems getting on and off the examination table or any problems dressing and undressing. These actions presumably would require both arms. Plaintiff was able to use his thumbs and fingers to flip pages.[6] Dr. Ramchandani also recorded observations about plaintiff's motor

---

[6] This observation contradicted arguments plaintiff's counsel made in the pre-hearing brief. Specifically, counsel asserted that plaintiff "cannot use his right hand or arm for fine or gross manipulation." R. 325.

system (*e.g.* no wasting and brisk reflexes). As for the right arm, Dr. Ramchandani observed that the power in plaintiff's right shoulder was 3+/5 and the power in his right elbow and wrist were both at 4/5. The relevant issue is not whether this Court or plaintiff's counsel could medically second-guess the conclusions that the agency doctors drew from this report and from the other evidence, but merely whether there was *some* relevant evidence in the record for the agency doctors to rely on or whether, as plaintiff argues, the record was bereft of any such evidence. In sum, the Court finds that the agency opinions were based on relevant evidence and that the ALJ, in turn, could rely on those opinions.

More broadly, another weakness with plaintiff's first argument is that it focuses solely on the two agency opinions and ignores the rest of the ALJ's decision. *See Olivas v. Berryhill*, 2018 WL 6604250, *4 (N.D. Ill. Dec. 17, 2018) ("by limiting her appeal to just the medical opinions, plaintiff has chosen a narrow path to a remand."). The ALJ did not just rely on the two agency opinions, but also relied on numerous other rationales. Plaintiff ignores them entirely.

To summarize, the ALJ's broadest finding was that plaintiff's problems from the November 2014 stroke improved over time. The ALJ noted that the objective findings made by plaintiff's doctors only partially supported plaintiff's allegations. For example, the ALJ noted that plaintiff's speech aphasia was described by his doctors as mild, and plaintiff could be understood by his doctors. R. 21. The ALJ observed that Dr. Kumar and Dr. Sonti found that plaintiff's neurological findings were mostly normal. The ALJ noted that plaintiff had only mild treatment. R. 21 ("Overall, the record lacks treatment demonstrating a more limiting impairment."). The ALJ relied on plaintiff's ability to do various activities, including walking a mile. The ALJ observed that plaintiff did not mention his current problems (other than vision

limitations) when he sought a commercial driver's license.[7] Relatedly, the ALJ reasoned that plaintiff's attempt to work as a truck driver showed that "he feels he is capable of engaging in work activity." *Id.* Finally, the ALJ noted that plaintiff was able to do fairly vigorous physical activities in his part-time job with the Salvation Army. These included scrubbing sinks and big pots. R. 51.

Plaintiff has not disputed or criticized any of these rationales, either factually or legally. They are well-recognized rationales that ALJs have relied on in many cases.[8] In sum, plaintiff's initial premise—that the ALJ did not have substantial evidence supporting her decision—has not been proven. This conclusion removes the central pillar supporting the plaintiff's argument that the ALJ was required to further develop the record.

But this argument has another problem as well. To obtain a remand, plaintiff must show that prejudice was likely from the failure to develop the record. *See Williams v. Saul*, __ Fed. Appx. __, 2019 WL 4233633, *3 (7th Cir. Sep. 6, 2019) (a remand for failure to develop the record is only required when there is a "significant" omission in the evidence, which is one that "likely" would have "prejudiced the proceedings); *Johnson v. Berryhill*, 745 Fed. Appx. 247, 250 (7th Cir. 2018) ("[A]n ALJ must consult with an expert only when, in the ALJ's opinion, the new evidence might cause an initial medical opinion to change."). Plaintiff has not pointed to any concrete evidence or even any theoretical argument suggesting that new evidence likely would have changed the outcome.

---

[7] In fact, plaintiff made a number of statements in the record, several of which are summarized in the fact section above, to the effect that his problems had largely gone away.
[8] *See, e.g., Carlson v. Berryhill*, 2018 WL 5279168, *6 (N.D. Ill. Oct. 24, 2018) ("Lack of treatment is a valid and common rationale used to discount a claimant's credibility."); *Murphy v. Astrue,* 454 Fed. Appx. 514, 520 (7th Cir. 2012) (the ALJ properly relied on the fact that plaintiff's allegations were "inconsistent with objective medical evidence and with her part-time weekend work as a CNA"); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("discrepancies between the objective evidence and self-reports may suggest symptom exaggeration.").

The main piece of evidence—arguably, the only one—that plaintiff has identified as being important was the occupational therapy records.[9] The Government argues that plaintiff is only relying on speculation that these records could be relevant. This Court agrees.

Plaintiff's argument is based on his own testimony. At the hearing, plaintiff testified that he underwent rehabilitation therapy for three to four months after his stroke. R. 39. This would mean that it occurred from approximately November 2014 to February 2015. Plaintiff testified that over this time he eventually regained the ability to walk and got more strength in his right leg. He started out using a walker but no longer needed it by the end of this therapy. *Id.*

Plaintiff has not explained why these records likely would change the ALJ's thinking. Plaintiff's testimony about this occupational therapy is consistent with the ALJ's general thesis that plaintiff's problems were improving over time. But even if these records did not show full improvement at this time, this would not necessarily undermine the ALJ's improvement rationale because this therapy ended in early 2015. This was well before many of the events and findings the ALJ relied on. These included normal objective examination findings from Dr. Kumar and Dr. Sonti in 2016; statements plaintiff made in 2016 (*e.g.* that his right-sided problems were mostly "gone"); plaintiff's attempt to work as a truck driver in 2016; and plaintiff's part-time

---

[9] The Court notes that plaintiff's counsel never told the ALJ that these records, or any other evidence not in the record, were important or otherwise notified the ALJ that additional evidence was needed. *See* Ex. 22E; R. 36 (counsel: "as I said, you know, the record is complete"); R. 38 (counsel: "we have everything"). While this does not preclude plaintiff from raising this issue on appeal, when a claimant is represented by counsel at the administrative hearing, a presumption can be made that counsel made the "best case" for the claimant before the ALJ. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). The Court acknowledges that the ALJ had an independent duty to develop the record, but the ALJ reasonably could have believed the record was sufficient. Counsel's silence bolstered that ALJ's conclusion. *See generally, Spies v. Colvin*, 641 Fed. Appx. 628, 635 (7th Cir. 2016) ("Most importantly, nowhere in Spies's medical records is there mention of a need for an MRI. Spies, who was represented by present counsel, did not argue before the ALJ that an MRI should be ordered and did not highlight any potential soft-tissue damage that such a diagnostic might reveal."); *Buckhanon v. Astrue*, 368 Fed. Appx. 674, 679 (7th Cir. 2010) (the "appropriate inference" to be drawn from counsel's failure to get a medical opinion, or to ask the ALJ to recontact the state-agency doctors, is that counsel had "decided that another expert opinion would not help"); *Halsell v. Astrue*, 357 Fed. Appx. 717, 723 (7th Cir. 2009) ("[T]he ALJ was permitted to assume that Halsell, who has always been represented by counsel, was 'making the strongest case for benefits,' so it was not improper for her to draw a negative inference from the fact that no treating physician opined that Halsell is disabled.").

work at the Salvation Army in 2016. There is no concrete basis for believing that the therapy records contained some unknown or hidden fact that would materially change the ALJ's analysis. Plaintiff's request for these records is thus tantamount to a fishing expedition.

Aside from the occupational therapy records, plaintiff has only made a few other vague suggestions as to how the record might have been developed. And these were only made in the opening brief, and not mentioned again in plaintiff's reply brief. As a result, these arguments could be deemed waived. *See Slayton v. Colvin*, 2015 WL 137305, *4 (W.D. Wisc. Jan. 9, 2015) ("plaintiff omitted this argument from her reply brief, so she has abandoned or forfeited it"). But even considering them, the Court does not find that they warrant a remand. Plaintiff suggests that the ALJ should have contacted medical sources or obtained a consultative examination. These arguments suffer from the same problems discussed above. Plaintiff has not identified what medical source should have been contacted. Perhaps plaintiff is referring to Dr. Mueller-Kronast, although plaintiff did not mention him by name. However, even if the ALJ had asked Dr. Mueller-Kronast for an updated opinion, it is questionable whether, in 2017 at the time of the hearing, he could have provided any significant new information given that he only saw plaintiff once in early 2015 and given that his notes from that visit indicated that plaintiff had already "significantly improved." As for the request to get a consultative examination, the Government points out that the ALJ did get such an examination from Dr. Ramchandani. It is unclear whether plaintiff simply overlooked this fact or whether plaintiff is suggesting that a second examination should have been ordered. In any event, plaintiff has not provided a persuasive argument why a second such examination would have revealed materially new information.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment [12] is denied; the government's motion [20] is granted; and the decision of the ALJ is affirmed.

Date: November 8, 2019      By: _____
                                Lisa A. Jensen
                                United States Magistrate Judge